# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

SHEILA FIEBIGER,                          :

     Plaintiff,                          :

                                   Case No. 3:10cv00361

 vs.                                       :

                                   District Judge Timothy S. Black

MICHAEL J. ASTRUE,                        :   Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                  :

     Defendant.                          :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.   Introduction

Plaintiff Sheila Fiebiger filed an application for Disability Insurance Benefits (DIB) with the Social Security Administration claiming that her health problems prevented her from substantial gainful employment.  This roadblock to employment began on December 31, 2000, according to Plaintiff.  Her health problems include, in part, osteoarthritis and fibromyalgia.  She suffers pain in her shoulder joints and has pain, swelling, and weakness in her hands, wrists, and feet.  Fatigue troubles her nearly all the time.  And she suffers from depression, weakness, and shortness of breath.

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff's initial administrative proceedings proved unsuccessful for her.  As a result, her application and supporting materials proceeded to a hearing before Administrative Law Judge (ALJ) James I.K. Knapp.  He later, in September 2009, issued a written decision, concluding that Plaintiff was not eligible to receive DIB because she was not under "disability" within the meaning of the Social Security Act.  (Doc. #8, PageID #s 60-73).

Believing she is under a DIB-qualifying "disability," Plaintiff brings the present case challenging the ALJ's non-disability decision.  The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13), the administrative record, and the record as a whole.  She seeks an Order remanding, at minimum, this matter to the Social Security Administration.  The Commissioner seeks an Order affirming ALJ Knapp's decision.[2]

This Court has subject matter jurisdiction over the parties' dispute because the ALJ's non-disability decision constituted the final decision denying Plaintiff's DIB application.  *See* 42 U.S.C. §405(g).

---

[2]  The ALJ apparently misstated that Plaintiff had also filed an application for Supplemental Security Income.  (Doc. #8, PageID #60).  This has no substantive significance because a "disability" is defined nearly the same under both programs, *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986), and because Plaintiff does not fault the ALJ for referring to an SSI application.

## II.    BACKGROUND

### A.    <u>Plaintiff and Her Testimony</u>

Plaintiff has an eighth grade education. She worked for many years in her husband's restaurant. She did cleaning, bartending, picking up supplies, and running errands. She performed such work part time from 1999 until 2006. (Doc. #8, PageID #80).

Plaintiff has arthritis in her wrists, feet, and knees. During ALJ's hearing, the ALJ asked Plaintiff why she had stopped working. She answered:

> Because, of my swelling. When I would do things my hands would swell. If I, if I used them. And when I wake up in the morning I'm really like achy and in pain. And I had to start taking pain medications. And actually my, my memory and my concentration go really bad.

*Id*. at PageID #81. Plaintiff takes Celebrex for pain relief and takes blood pressure medication.

Plaintiff also has breathing problems. She experiences shortness of breath "[a]lmost all the time...," such as when she gets upset or walks more than five minutes. *Id*. at PageID #s 81-82. Plaintiff testified, "I can't do any kind of lifting or carrying things." *Id*. at PageID #82. She cannot use her hands because of pain and because they are weak and will swell with use. *Id*. at PageID #88.

Plaintiff could walk on a flat surface for five or six minutes, at most. She could stand for ten to fifteen minutes if leaning on something. She could sit for ten to fifteen

3

minutes but would then need to stand and move around due to stiffness.  She testified that the most weight she could lift comfortably was ten pounds.  *Id.* at PageID #86.

Plaintiff testified that a dermatologist had also diagnosed her with an autoimmune condition called morphea.  Morphea refers to "[l]ocalized or widespread sclerotic plaques of the skin, often arrayed in lines or bands."[3]  Taber's Cyclopedic Medical Dictionary at 1322 (19th Ed. 2001).  This conditioned first manifested itself as brown coloration on Plaintiff's hands.  It spread to her arms around the time when she had also begun to have joint pain.  *Id.* at PageID #87.  A skin biopsy proved inconclusive.  By the date of the ALJ's hearing (July 2009), Plaintiff no longer received treatment for morphea, although the condition apparently persists.  *Id.*

For many years, Plaintiff has also suffered from depression, causing her to cry a lot (every day) and have suicidal thoughts ("All the time.  Every day.").  *Id.* at PageID #s 82-84.  She had been in treatment for depression for over twenty years.  *Id.*  At the time of the ALJ's hearing, Plaintiff had been receiving treatment from a psychiatrist (once per month) and from a counselor (every two weeks).  She had been taking prescription medications for depression since 1990.  Fatigue, memory, and concentration problems also troubled her.  She slept six hour per night and napped forty-five minutes during the day.

---

[3]  The record occasionally misspells "morphea" as "morphia."  "Morphia" refers to Morphine, the well-know pain medication.   Taber's at 1322.

As to her daily activities, Plaintiff watched a lot of television, talked on the phone for forty-five minutes, visited people only on holidays, did some laundry, and put dishes in the dishwasher.  *Id*. at PageID #s 84-85.  She did not sweep or vacuum, she did not go to church or the movies, she had no hobbies, she belonged to no clubs, and she did not mow the lawn, take vacations, or drink alcohol.  *Id*. at PageID # 85.

### B.     Medical Records and Opinions

In a December 2006 letter, Roger H. Griffin, M.D. wrote a letter to the Ohio Bureau of Disability Determinations explaining that he had been treating Plaintiff since April 2005 when she "presented with a history of fatigue which had been present for the previous couple of years which she thought was getting worse."  Dr. Griffin continued:

> She had also been having symptoms of depression.  In addition, she did have arthralgias involving her fingers, as well as low back pain describing morning sickness lasting 1-2 hours.  She also has a history of carpal tunnel syndrome.  On physical examination, she did not have any objective synovitis or joint deformities.  Hyperpigmentation of her lower arms, however, was noted.  This was biopsied and consistent with a diagnosis of morphia [sic].  She has not had any other clinical manifestations of systemic sclerosis.  She has been found to have persistently elevated sedimentation rate and lower titer ANA.  I feel that her symptoms could be well-related to her underlying connective tissue disease. I currently have her on Plaquenil, Sulfasalazine, and Celebrex without significant clinical benefit to date.  I do feel that her fatigue and joint pain do limit her ability to have gainful employment....

(Doc. #8, PageID # 431).

Several months later Dr. Griffin wrote another letter describing Plaintiff's health and her treatment.  He wrote:

The above patient has been in my professional care since 04/01/05 when she was referred to me for evaluation of fatigue, joint pain, and hyperpigmentation of her forearms. The fatigue had been present for approximately two years and was progressing. She had also been experiencing feelings of depression and was being treated with Prozac. Her joint pain was most prominent in her fingers and lower back. She also had symptoms of carpal tunnel syndrome at that time. During the interval that I have followed her there has been questionable evidence of active synovitis in her MCPs [metacarpophalangeal joints]. Her worst joint in her left thumb carpal metacarpal joint which I feel is related to osteoarthritis. [A] biopsy of her skin lesion was consistent with morphia [sic]. Her serological workup has not disclosed any abnormal antibodies related to connective tissue disease. She is currently taking Celebrex 200 m.g. b.i.d. for arthritis symptoms. Her fatigue did seem to improve on Prednisone therapy, so I have placed her on Hydroxychloroquine and Sulfasalazine to try to help with this constitutional symptom as well as any possible inflammatory component of arthritis. Her impaired functional capacity at this time appears to be most related to her generalized fatigue, the role of depression vs. connective tissue disease remains uncertain. Her hand involvement does represent functional limitations and the fatigue does limit her physical stamina with respect to employment.

(Doc. #8, PageID #430).

Plaintiff's hand problems led her to Mark S. Klug, M.D. in April 2007 for

evaluation. Physical examination was positive for Tinel's and Phalen's over the median

nerve at the wrist, right greater than left.[4] She had a positive grind test involving the

CMC (carpal metacarpal) joint of her left thumb. An x-ray of her left thumb showed

"severe osteoarthritic changes with joint space narrowing and subchondral sclerosis

---

[4] "In the Tinel test, the doctor taps on or presses on the median nerve in the patient's wrist. The test is positive when tingling in the fingers or a resultant shock-like sensation occurs. The Phalen, or wrist-flexion, test involves having the patient hold his or her forearms upright by pointing the fingers down and pressing the backs of the hands together. The presence of carpal tunnel syndrome is suggested if one or more symptoms, such as tingling or increasing numbness, is felt in the fingers within 1 minute. Doctors may also ask patients to try to make a movement that brings on symptoms." http://www.ninds.nih.gov (search: "Tinel" or "Phelan").

consistent with osteoarthritis." *Id*. at PageID #473.  Dr. Klug diagnosed bilateral carpal tunnel syndrome, worse on the right, and "severe arthritis CMC joint left thumb." *Id*.  Dr. Klug also ordered an EMG, the results of which were "suggestive of bilateral median nerve entrapment neuropathy across the wrist (bilateral carpal tunnel syndrome)." *Id*. at PageID #448.

In June 2007 W. Jerry McCloud, M.D. assessed Plaintiff's physical residual functional capacity for the Ohio Bureau of Disability Determinations.  In doing so, he reviewed the administrative record but did not perform a physical exam.  *Id*. at PageID #s 451-58.

Dr. McCloud thought that Plaintiff could perform light work.  *Id*. at PageID #452. He based this on Dr. Klug's April 2007 records that revealed Plaintiff's history of osteoarthritis; no obvious atrophy or swelling in either upper extremities; full range of motion in both elbows; supination and pronation were complete; negative Tinel's sign over her median, ulnar, and radial nerve at the wrist bilaterally, more uncomfortable on the right; positive grind test involving the CMC joint of her left thumb; full range of motion metacarpophalangeal joint of her thumb; stable MCP, and; EMG/NCV positive for advanced carpal tunnel syndrome bilaterally, worse on the right.  *Id*. at PageID #s 452-53.  Dr. McCloud noted that Plaintiff's "statements appear to be credible." *Id*. at PageID #456.

Dr. Klug performed surgery on Plaintiff's left wrist and thumb in June 2007.  Page ID #s 591-92.  He operated on her right wrist in August 2007.  *Id*. at PageID #s 464-65.

7

In September 2007 Dr. Klug noted a "rather impressive flexor synovitis of the right thumb and 5th finger."  *Id*. at PageID #466.  He treated her with injections and recommended further hand exercises/therapy.  *Id.*  And he noted, "I think overall she is improving and if we can clear up her synovitis she can make some progress in her therapy.  I will see her back in three weeks for follow-up."  *Id*.  Plaintiff 'no showed" for her appointment on October 11, 2007, according to Dr. Klug's records.  *Id*.

Carl F. Hoyng, D.O. began treating Plaintiff in January 2007, although Plaintiff continued to see Dr. Griffin for myalgia and arthralgias.  In December 2008 rheumatologist Jon P. Ryan, D.O. evaluated Plaintiff for possible inflammatory arthritis. *Id*. at PageID #s 557-59.  In addition to the more specific pains in her hands and wrists, Plaintiff reported diffuse muscle aches and pains to her shoulder, paraspinal region, and thighs.  Dr. Ryan noted that Plaintiff's diffuse pains were associated with difficulty falling asleep and staying asleep.  *Id*. at PageID # 557.  He noted some hyperpigmentation on Plaintiff's forearms and some slight skin thickening.  Dr. Ryan further noted some changes consistent with osteoarthritis, including some possible chronic synovial thickening at the PIP (finger) joints.  He observed changes at Plaintiff's first CMC joint bilaterally consistent with osteoarthritis.  And Dr. Ryan noted multiple tender points consistent with fibromyalgia.  Given her muscle aches, problems with sleeping and these tender points, Dr. Ryan suspected fibromyalgia was an issue.  *Id*. at PageID # 558.

Dr. Ryan ordered a series of imaging studies, which Plaintiff underwent in early January 2009.  An x-ray of her left hand showed postsurgical changes of the CMC.  *Id*. at

8

PageID #553.  A whole body scan showed a mild increased uptake at the bilateral acromioclavicular joint and in the left wrist.  *Id*. at PageID #552.  "The findings [were] most suggestive of degenerative/arthritic change."  *Id*.

In his report to Dr. Hoyng in late January 2009, Dr. Ryan assessed Plaintiff with diffuse arthralgias, myalgias, sleep difficulty, fibromyalgia, and some mild osteoarthritis. He reported that Plaintiff had a history of elevated sedimentation rate, but he also explained that her last sedimentation rate on "12/231/09 was 26 within normal limits." *Id*. at PageID #554.  And, according to Dr. Ryan, the results of Plaintiff's bone scan of her left wrist and AC joints were consistent with degenerative arthritis, "x-rays showed no erosive changes consistent with rheumatoid arthritis and physical exam is inconsistent at this time with active joint inflammation or other physical evidence or rheumatologic disease."  *Id*.

When Dr. Griffin saw Plaintiff in July 2009, he noted that he could not establish a specific inflammatory arthritis diagnosis, yet he suspected that fibromyalgia was a likely component of her problem.  *Id*. at PageID #s 588-89.   Dr. Griffin believed that "her depression and pulmonary disease ... also plays a role in her overall well-being and functional status."[5]   *Id*. at PageID #589.

In 1990 Plaintiff was diagnosed with major depression, recurrent with suicidal ideas.  She spent a week in the hospital where she received counseling and antidepressant

---

[5]   Three months earlier, in late April 2009, Plaintiff had been hospitalized with acute respiratory failure.

medication.  *Id*. at PageID 247.  After leaving the hospital, she continued on antidepressant medications prescribed by her primary care physician.

In December 2006 Ty Payne, Ph.D. evaluated Plaintiff's mental health for the Ohio Bureau of Disability Determinations.  At the time, Plaintiff took Fluoxetine (Prozac) for her depression.  Dr. Payne diagnosed Major Depression, severe and assigned a GAF[6] of 52 (Doc. #8, PageID # 314) indicating "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34.

Dr. Payne opined that Plaintiff's ability to relate to others was moderately impaired by her depression.  Her concentration was mildly impaired.  Her ability to withstand the stress and pressures of day-to-day work activity was mildly to moderately impaired.  (Doc. #8, PageID # 314).

Psychologist Guy Melvin, Ph.D., reviewed the administrate record in January 2007 for the Ohio Bureau of Disability Determinations.  *Id*. at PageID #s 400-18.  He checked boxes indicating his opinion that Plaitniff was not significantly limited in nearly all areas of her mental work abilities.  The only exceptions were her moderate limitations in four areas, including, for example, her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  Dr. Melvin did not find

_____

[6] GAF – Global Assessment of Functioning – is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Hash v. Commissioner of Social Sec*., 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

Plaintiff to be markedly limited in any area of her mental work abilities.  *Id*. at PageID #s 401-02.

In reaching his conclusions, Dr. Melvin gave weight to the consultative examiner (Dr. Payne).  Dr. Melvin found Plaitniff's statements "credible as well."  *Id*. at PageID # 403.  And he believed that Plaintiff could "perform tasks with a low production quota and occasional superficial interaction with others."  *Id*.

Dr. Melvin's assessment was affirmed in May 2007 by another record-reviewing psychologist, Vicki Casterline, who provided no explanation in her once-sentence affirmation.  *Id*. at PageID # 450.

In August 2008 Plaintiff began mental-health treatment at Advanced Therapeutic Services.  She reported that she had felt depressed most of her life and that her physical problems had contributed to her increased depression. Tr. 574. On mental status examination her mood was depressed and tearful. She had recent ideas of suicide but stated she would never hurt herself.  *Id*. at PageID #s 629-33.  Her diagnoses included dysthymic disorder and major depression recurrent.  *Id*. at PageID #632.

Plaintiff began counseling with little change in her depression.  She was seen by the psychiatrist who recommended increasing the dose of Paxil. Tr. 567-69.  The psychiatrist diagnosed a Mood Disorder secondary to a General Medical Condition. Tr. 569.  Plaintiff continued to see both a counselor and psychiatrist. Tr. 548-66.  Throughout her time in counseling, her progress fluctuated on a three-point assessment scale – regressed, improved, unimproved.  *Id*. at PageID #s 605-33.

11

**III.** **"Disability" Defined and ALJ Knapp's Decision**

To be eligible to receive Disability Insurance Benefits, an applicant must – among other requirements – be under a "disability" within the meaning of the Social Security Act. 42 U.S.C. §423(A)(1)(e); *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). "The Social Security Act defines 'disability' as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Rabbers v. Comm'r of Soc. Sec*., 582 F.3d 647, 652 (6th Cir. 2009) (quoting, in part, 42 U.S.C. §423(d)(1)(A)). An applicant for social security benefits bears the ultimate burden of establishing that he or she is under a benefits-qualifying disability. *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 275 (6th Cir. 2010).

During Plaintiff's administrative proceedings, ALJ Knapp sequentially evaluated the evidence under 20 C.F.R. § 404.1520(a)(4). In ALJ's Knapp's words:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2. The claimant has not engaged in substantial gainful activity since January 31, 2007.... She was engaged in substantial gainful activity prior thereto.

3. The claimant has the following impairments which are severe for Social Security purposes: osteoarthritis affecting the shoulder joints and the non-dominant left wrist: chronic obstructive pulmonary disease; and major depression....

12

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1....

5.      After careful consideration of the entire record, the undersigned finds that the claimant lacks the residual functional capacity to: 1) lift more than ten pounds frequently or twenty pounds occasionally; 2) push or pull more than ten pounds with the non-dominant hand; 3) crawl or climb ladders or scaffolds; 4) reach above shoulder level; 5) use the non-dominant hand for constant handling or fingering; 6) have more than occasional contact with public, supervisors, or co-workers; 7) have concentrated exposure to fumes, dust, odors, or poor ventilation; or 8) do other than low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous).[7]

[6].    The claimant is not capable of performing past relevant work as a server and bartender.

[7].    The claimant..., at [her] alleged date of onset of December 31, 2000..., would have been classified as a younger individual; at the time of her application she was 51 and at the time of the hearing she was 54 years old, which classifies her as closely approaching advanced age...

[8].    The claimant has a limited education and is able to communicate in English....

[9].    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills....

[10].   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exists in significant numbers in the national economies that he [sic] can perform....

---

[7]  The ALJ's findings in paragraph 5 assess Plaintiff's "residual functional capacity" or the most she can still do despite her limitations.  20 C.F.R. § 404.1545(a)(1); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  Given these abilities and limitations, the ALJ essentially rated Plaintiff as able to perform a limited range of light work.  ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b)).

(Doc. #8, PageID #63-72 (footnote added)).  These findings led ALJ Knapp to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible to receive Disability Insurance Benefits.

**IV.**   **Judicial Review**

Judicial review determines, in part, " whether the ALJ applied the correct legal standards..." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  A failure to apply the correct legal standard can occur when the ALJ fails to follow a mandate dictated by Social Security Regulations – for example, by not providing "good reasons" for the weight the ALJ places on a treating physician's opinions.  *See* 20 C.F.R. §404.1527(d)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).

> It is an elemental principle of administrative law that agencies are bound to follow their own regulations....  The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates....  An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process.  Where a prescribed procedure is intended to protect the interests of a party before the agency, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.

*Id*. at 545 (internal citations and punctuation omitted).

Judicial review of an ALJ's decision further considers "whether the findings of the ALJ are supported by substantial evidence." *Blakley*, 581 F.3d at 406; *see Bowen*, 478 F3d at 745-46.  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007).  Substantial evidence is present "if a 'reasonable mind might accept the relevant evidence as adequate to support..." the ALJ's factual findings.  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  The existence of substantial evidence does not depend on whether the Court agrees or disagrees with the ALJ's findings.  *Rogers*, 486 F.3d at 241; *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead the ALJ's decision is affirmed "if his findings and inferences are reasonably drawn from the record or supported by substantial evidence even if that evidence could support a contrary decision."  *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010).

"Yet, even if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec.*  582 F.3d 647, 651 (6th Cir. 2009); *see Wilson*, 378 F.3d at 546-47; *see also Kalmbach v. Comm'r of Soc. Sec.*, 2011 WL 63602 at *6 (6th Cir. 2011)("we must reverse and remand if the ALJ applied the incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different.").

## V.    Discussion

### A.    Plaintiff's Issues

Plaintiff identifies two issues:

15

> Whether Administrative Law Judge Knapp's finding concerning residual
> functional capacity is supported by substantial evidence where the
> administrative law judge claimed that the opinion of Treating Physician
> Griffin was consistent with his finding of residual functional capacity but
> ignored the fact that this opinion was inconsistent with an ability to sustain
> employment on a regular and continuing basis?
>
> Whether Administrative Law Judge Knapp's finding concerning residual
> functional capacity is supported by substantial evidence where the
> administrative law judge failed to fairly evaluate Ms. Fiebiger's experience
> of pain and fatigue in light of her depression and fibromyalgia?

(Doc. #10, PageID #682).  Plaintiff's answers to these questions, together with her more

specific arguments, lead her to conclude that substantial evidence does not support the

ALJ's decision.


**B.**     **Dr. Griffin**

Plaintiff argues that substantial evidence does not support the ALJ's decision

because he failed to provide good reasons for rejecting treating physician Dr. Griffin's

opinions.

Social Security Regulations and case law require ALJs to apply controlling weight

to a treating medical source's opinion when it is both well supported by medically

acceptable data and not inconsistent with other substantial evidence of record.  *See* 20

C.F.R. §404.1527(d)(2); *see also Rabbers*, 582 F.3d at 660; *Rogers*, 486 F.3d at 242;

*Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If a treating

medical source's opinion is not entitled to controlling weight, it must be weighed under

"a host of other factors, including the length, frequency, nature, and extent of the

treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242.

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources.  *See* 20 C.F.R. §404.1527(d)(1).  However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views non-examiners "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2 .  Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. §404.1527(d), (f); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

The ALJ fully and accurately described the above legal criteria in his discussion of Dr. Griffin's opinions.  (Doc. #8, PageID #70).  In doing so, the ALJ did not err as a matter of law.  *See* 20 C.F.R. §404.1527(d); *see also Rabbers*, 582 F.3d at 660.

The ALJ did not wholly reject Dr. Griffin's opinion.  Instead, when assessing Plaintiff's residual functional capacity (RFC), the ALJ set limitations consistent with Dr. Griffin's letters and records.  The ALJ wrote, "It would appear that the limitations imposed in the RFC set forth above clearly encompasses the generic concerns expressed

17

by Dr. Griffin in that they limit claimant to a reduced range of light work, thereby

addressing her fatigue, and in that they limit use of the non-dominant hand and arm, the

only arm that is affected by her impairments." (Doc. #8, PageID #70). Although a

cautious reader might quibble with the ALJ's use of the phrase "generic concerns," it is

reasonable to read – as the ALJ did – Dr. Griffin's opinions as not setting any particularly

limitation on Plaintiff's work abilities, other than those the ALJ accepted. In addition, the

ALJ carefully considered the treatment Dr. Griffin provided to Plaintiff as a reason not to

add more restrictions to Plaintiff's residual functional capacity. The ALJ explained, in

part:

> Dr. Griffin began seeing the claimant in 2005 for fatigue, joint pain, and hyperpigmentation of the forearms. The fatigue was treated conservatively with Plaquenil. The joint pain was noted and also treated conservatively with Celebrex. The claimant was referred to dermatologist Dr. Levitt for a biopsy for the morphea condition. Dr. Griffin interpreted the report as consistent with early evolving morphia [sic], however the serological work-up has not disclosed any abnormal antibodies relative to connective tissue disease....

> Dr. Griffin continued to see the claimant through August 2008. The diagnoses remained arthralgia, myalgia, and depression. The treatment also remained conservative. She did not return to Dr. Griffin for almost a year. A repeat skin biopsy was completed and was not characteristic of morphia [sic]. Dr. Griffin noted that she had full range of motion without objective synovitis. Her sedimentation rate was normal at 16 and her C-reactive protein was 1.0, which is only minimally elevated. He indicated that he was not able to establish a specific inflammatory arthritis diagnosis and suspected that fibromyalgia may be a component of her problem.

*Id*. at PageID #s 70-71. The information Dr. Griffin set forth in his December 2006 and

March 2007 letters is consistent with the ALJ's review and with his decision not to graft

18

additional restrictions onto Plaintiff's residual functional capacity.  Substantial evidence, therefore, supports the ALJ's review of Dr. Griffin's opinions.  Additionally, when Dr. Griffin's opinions are read in conjunction with the other evidence upon which the ALJ relied, substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity.  *See* Doc. #8, PageID #s 68-72.

### C.    Plaintiff's Fatigue, Fibromyalgia, Depression, and Credibility

Plaintiff acknowledges, "the ALJ did not feel that [her] testimony that she could sit, stand, or walk for only short periods of time was supported by objective medical evidence."  (Doc. #10 at PageID #694).  And Plaintiff recognizes that the ALJ concluded, "There is no ongoing medical condition that would explain such limitations.'"  *Id*. (quoting ALJ's decision at PageID# 71).  Plaintiff contends that the ALJ erred because she has at least two documented medical conditions that could explain her fatigue and limited abilities: fibromyalgia and depression.

A social security applicant's credibility is evaluated in two parts:  "First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities."  *Id*. (citations omitted).  A list of factors – for example, "claimant's daily

activities; location, duration, frequency and intensity of symptoms; factors that precipitate and aggravate symptoms...," *id.*, assist the ALJ in evaluating an applicant's symptoms.

The ALJ accurately described the applicable standards and likewise listed the specific factors applicable to evaluating credibility.  *See* Doc. #8, PageID# 63-64.  The ALJ further considered the correct credibility standards when assessing Plaintiff's residual functional capacity.  *See id.*, Page ID#s 68-69.  In light of this, the ALJ did not err as a matter of law when evaluating Plaintiff's credibility.  *See Rogers*, 486 F.3d at 247 (describing the applicable legal criteria).  The issue, then, is whether substantial evidence supports the ALJ's reasons for not fully crediting Plaintiff's testimony.

"[T]he ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'  Rather, such determinations must find support in the record."  *Rogers*, 486 F.3d at 247 (quoting in part Social Sec. Ruling 96-7p, 1996 WL 374186, at * 4).  When substantial evidence supports the ALJ's credibility findings, his findings are "accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).

Plaintiff contends that her depression and fibromyalgia "could explain her fatigue and limited abilities," and then cites to an examination by Dr. Ryan and an ambiguous statement from Dr. Griffin.  (Doc. #10, PageID #s 694-95).  Plaintiff's argument lacks merit.

While Plaintiff believes that her depression or fibromyalgia caused her fatigue, this belief is simply a lay hypothesis. Plaintiff cannot point to any medical source who made a causal connection between either condition and her alleged fatigue. *See* 20 C.F.R. § 404.1508 (impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings, and not solely by claimant's statement of symptoms). Dr. Griffin only stated that "with respect to the generalized fatigue, the role of depression vs. connective tissue disease remains uncertain." (Doc. #8, PageID #430). Thus, Dr. Griffin did not attribute Plaintiff's fatigue to depression (or to any other condition) – rather, he was uncertain as to its etiology.

Similarly, in December 2008, Dr. Ryan cited at least four possible diagnoses – "possible inflammatory arthritis," "possible Reynaud's phenomenon and morphea," "possible undifferentiated connective tissue disease," and "she may have fibromyalgia" – without making a link between any of them and fatigue. *Id*., PageID #558. The next time he saw Plaintiff (mid-January 2009), Dr. Ryan assessed "diffuse arthralgias and myalgias" without commenting about either fatigue or fibromyalgia. *Id*., PageID# 555. The last time Dr. Ryan saw Plaintiff, a few weeks later, he did not change his assessment, although he added that he believed Plaintiff had fibromyalgia, but he drew no causal connection between fibromyalgia and Plaintiff's fatigue. *Id*., PageID #554. The Commissioner correctly recognizes that although fibromyalgia symptoms include fatigue, this truism does not plug the gap in the record here – a claimant is required to prove disability with medical evidence relating to that claimant's specific functioning,

21

and not with a truism about what some people with similar conditions might experience. *See* 20 C.F.R. § 404.1508.

Equally important, no doctor of record ascribed any limitations to Plaintiff due to any fatigue. Her treating physician, Dr. Griffin, generally stated that Plaintiff's fatigue limited her, but he also acknowledged that medication helped her fatigue. (Doc. #8, PageID #s 430-31). Dr. Ryan never offered any opinion at all, and neither did any other treating source. Notably, the state agency physicians – the only sources who offered detailed opinions – indicated that Plaintiff could perform light work. *Id.*, Page ID#s 420-423, 452-58 .

Further, to the extent Plaintiff seeks to tie her alleged fatigue to her depression, the ALJ considered all the evidence related to her mental impairments and accommodated the restrictions suggested by Drs. Melvin, Casterline and Payne. *Id.*, PageID #69. Plaintiff cannot point to any opinion from a mental health source indicating that she had fatigue-related limitations stemming from any mental impairment. There is no evidence on this issue that the ALJ did not properly consider. The ALJ reviewed all the relevant evidence and concluded that Plaintiff's fatigue could be accommodated by limiting her to a restricted range of light work.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors lacks merit.

22

## IT THEREFORE IS RECOMMENDED THAT:

1.      The Commissioner's non-disability determination be AFFIRMED; and

2.      The case be terminated on the docket of this Court.


July 29, 2011

      s/Sharon L. Ovington      
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).